In the Matter of the Estate of KATHERINE MCGUIRE DRYER, Deceased.

Surrogate's Court, Monroe County, April 7, 1932.

*Rann, Vaughn, Brown & Sturtevant* [*J. E. Kelly* of counsel], for the petitioner.

*A: G. Dutcher*, for the respondent.

FEELY, S. Upon the return of a petition to compel production of a last will, a mutilated paper writing of that kind was filed by

the respondent widower, consisting of two typewritten pages and a cover, all fastened together, in the usual legal form. In this proceeding for the probate thereof, the paper was shown to have been duly executed at the outset, in August, 1925, but owing to its subsequent mutilation the question has arisen as to how much, if any, of it can be admitted.

The first two clauses provide for payment of debts and funeral expenses, and create a trust for perpetual care of the burial lot.

It is quite probable that testatrix herself was the one who cut out of this paper the " third," " fourth," " fifth " and " sixth " paragraphs, leaving intact the two later paragraphs, by the first of which the remainder on hand, after the death of her husband, is to go to three cousins, and by the last a power of sale is granted. The lawyer who drafted this will and attested it testified that the provisions for the husband were the main part of the original testamentary plan, and consisted of the right in him to use the residuary estate for and during his own life; and that the excised portions consisted largely of gifts of keepsakes, such as a shawl to some one whose name is as yet unascertained, and likewise a legacy of $100 to some one yet unknown, also a pair of diamond earrings, and so forth. Hearsay evidence was offered to show that the pair of earrings was to go to Agnes Strickland. This subsequent declaration of testatrix must be disregarded, under the ruling made in *Matter of Bescher* (132 Misc. 625, 627) and in *Matter of Kent* (169 App. Div. 388, 391).

The attorney's stenographer, who also attested this will, recalled only the execution of it. Her notes, if any, have not yet been found.

In the portion of the will that escaped the shears of the testatrix there are some expressions that reflect a dim outline of what the excised provisions for the life beneficiary were. They are, briefly, these: " Upon the death of my husband,  *  *  *  I direct that all the rest  *  *  *  remaining in the hands of such trustee, shall be equally divided  *  *  *.

" *  *  *  I empower  *  *  *  my executor  *  *  *  to sell and dispose of any real property  *  *  *  and that the proceeds thereof be paid by my said executor as such to Roy Strickland as trustee, for the uses and benefits of my said husband, Herman Dryer, as above set forth."

These excerpts show the husband's interest was that of a life beneficiary of a trust, rather than that of a life tenant; and the words, " Upon his death,  *  *  *  the rest remaining in the hands of the trustee," imply a possible right to invade principal; but upon what condition or in what circumstances does not appear,

except that the use, by a lawyer, of the plural form, "uses and benefits * * * as above set forth," implies the missing clauses contained some specifications and restrictions, and negatives the idea that the trust was for his general benefit absolutely; and so the remainder appears to have been subject to more than the ordinary risk of diminution inherent in almost every remainder.

The evidence falls short of what is requisite to prove either a lost will or the missing parts of this will (Surr. Ct. Act, § 143); but it does show that those missing parts did modify and qualify the portions that remain, in that possession of any remainder is literally postponed till the death of the husband; and, probably, that then there might legally be no unconsumed principal on hand for the remainderman.

The intention of testatrix in making this mutilation was to cut off her husband, and to increase the residue by what she thereby meant should be taken from him and from the other legatees above mentioned; and that the original will should no longer be effective in its first form; but that the new testamentary plan, meant to be evidenced by the papers in their present multilated state, should be effective as an amended last will of this testatrix, instead of the original. So far as the evidence discloses, there was no republication of the later testamentary plan represented by the product of the mutilation.

Proponent insists that the original will has never been revoked, and that the propounded paper, in its present mutilated state, should go to probate, notwithstanding the purport of the missing clauses has not been fully ascertained; and that if the court should conclude the life estate has not been proven, then the entire estate — excepting enough to carry out the first two clauses above mentioned — should be decreed to pass to the residuary legatees. Respondent objects that the "remains" are only a part of the original integral will; and that its integrity was, necessarily, destroyed by intentional destruction of a constituent part; and that the content of the missing clauses has not been accurately and fully proven, but that in so far as it has been proven the missing provisions are inseparably connected with the residuary clause, if the original is to stand as first written; but, if not, then the substitute plan shown by the mutilated "remains" has never been republished.

The cases on this subject can be said to fall into three, or possibly two groups, as the content of the missing or changed part is either wholly known, or wholly unknown, or only partially known. The case at bar lies, mainly, in the latter class, where enough of the altered or missing part is known to show its probable relation to the rest of the will.

Where the provisions of the changed or missing part have been fully ascertained, there is no doubt the whole will, as originally made, can go to probate, notwithstanding the deliberately attempted " partial " revocation, because the courts have made it plain that our statute permits revocation of a will only as an entirety. The difficulty, however, has never been finally settled that besets the other more pertinent group or groups, where probate is asked when the content of the missing or changed parts is unknown, either wholly or partially. This doubt arises from two sources, first, the practical revocation that has been successfuly made of both the part, and consequentially of the whole as an integral entity; and then from the intention to leave the " remains " in effect as a substitute will for the unmutilated original. It has been said that, in such cases, the original will is not all before the court; and what remains of the mutilated will, intended as a substitute for the original, has not been republished or executed according to the statute. (Cornell Law Quarterly, vol. 1, p. 215.)

In the case at bar, as in most like instances within its class, the " remains " are intended to stand as a new will; and in this case the intention of the mutilator was to increase the residue. If probate of the remaining fragment be granted it will accomplish just that result; and thus allow testatrix to make informally a different disposition of the property than that contained in the integral original will; and thus effectuate, practically, both a partial and a total revocation, in spite of both statutes, that on revocation (Dec. Est. Law, § 34) and that on execution (Id. § 21). There is, notwithstanding, authority for holding that merely increasing the residue thus does not stand in the way of probating the " remains." (*Matter of Kent, supra.*) Moreover, in the case last cited, the court, speaking of the result on the altered legacy, seems to take a stand that is a practical one, if not one that in all cases is a strictly legal one, when it declared that " the effect should be that its unknown amount would sink into the residue as * * * a *lapsed* legacy."

Although what successfully made it fail and so fall was an act of a testamentary character and intent, other than an ademption, done by testatrix on the face of the will itself, it is deemed not to be a " legal " revocation; and so, piecemeal probate is sometimes in order. Ordinarily, when a legacy " lapses " it falls into the residue. If that be so here, do these remaindermen take it free from any right of the legatee named in the original legacy to retrieve his property, if and when he succeeds in proving the content of the " unrevoked " missing part? Should we not consider as *obiter dictum* what the court remarked as to " lapse? " What is it that

determines whether the property shall go as in intestacy, or to the residuary, or be held to abide the proven event?

All this doubt and inconsistency — inevitable under the impractical theory that only as an entirety can a will be revoked — has long since been obviated in England, and in about fifteen of our States (38 L. R. A. [N. S.] 797, note) by legalizing partial revocation. Surrogate FOWLER remarked that " In England a part of a will may be revoked by its particular cancellation or destruction. * * * In many instances, not yet considered in this State, this ruling is consonant with the highest elements of a refined and precise system of justice. Why it should be held otherwise anywhere I cannot conceive." (*Matter of Parker*, [1917] 100 Misc. 219, 229.)

In one of the earliest cases under the Revised Statutes ([1854] *McPherson* v. *Clark*, 3 Bradf. 92), Surrogate BRADFORD stated that the common law recognized partial revocation; and after he had traced the derivation of the several statutes, down from the original Statute of Frauds, and noted their substantial similarity, he expressed the opinion that our Revised Statutes intended no change; and he cites a case decided before 1830, in which, so he says, partial revocation was recognized in this State. ([1811] *Jackson* v. *Holloway*, 7 Johns. 394.) However that may be, he had before him a will with cancellations that left the original still legible; and there were some interlineations. He admitted the will as it originally read. Such would also be the result to-day. A different opinion prevails now as to the continuity of the statute law in question. The opinion he expressed on partial revocation is a step in his process of reasoning, which altogether is valuable as showing a practical appreciation of the actual nature of the intention back of such changes or mutilations. He said that partial revocation, although permissible, depends on testator's intention; and the rule is not to give effect to part of a testator's intention when effect cannot be given to the whole of it. The intention here, he wrote, was not only to revoke the canceled legacy but to substitute the new matter that was interlined; but this insertion of the new matter was inoperative for want of re-execution and attestation; and the intention failing as to the substitution intended, it must, under the rule above mentioned, fail likewise as to the revocation intended.

Only two cases directly in point have been cited, but they are opposed to each other. The first is the ruling made in the Second Department in 1909 in *Matter of Curtis* (135 App. Div. 745). There, at the foot of a page in his last will, testator tore off all of the " third " paragraph but the words: " I give and bequeath unto

my brother-in-law Frank * * *." The surrogate found as a fact that the will was "in the words and figures following," repeating the initial fragment quoted above. He also found that no proof had been made that the "third" paragraph contained any other words than as found above. The witnesses testified that the original will was not torn when they signed it. This confirmed the natural inference that the sentence continued beyond the name of the brother-in-law. The evidence that was introduced as to the content of the missing portion seems to have been insufficient to justify the surrogate in finding exactly what the language of the paragraph originally was.

The decree of probate was reversed, and the matter sent back for new trial, apparently for two reasons:

(1) "The paper admitted to probate * * * is not in the form and condition in which the will * * * was when originally * * * written;" and

(2) That additional evidence may be introduced as to the contents of the missing clause. "It would be unfortunate," continued the higher court, "if by reason of inability to produce sufficient satisfactory evidence upon that point it became necessary to deny probate altogether."

Whether the sentence just quoted must be deemed to be merely a dictum (*Matter of Enright*, 139 Misc. 192, 196) remains a question in the mind of some.

Our Fourth Department, by a divided court, in 1915 passed on a similar case in *Matter of Kent* (169 App. Div. 388). There two paragraphs had been cut out of a will, resulting in an increase in the residue; and on hearsay evidence of their purport the surrogate granted probate; but the court of review found that even if such testimony had been allowed to remain, it was not of sufficient probative value to support the findings as to the contents of the missing clauses. This conclusion required a new trial: "Where the contents of the parts excised from the will may be shown by competent evidence. In that case the will should be probated including the missing clauses as still a part of the will and unrevoked. * * * In case such evidence is not forthcoming, then we think that part of the will which remains should be probated."

Anent the surrogate's ruling (89 Misc. 16), Mr. H. W. Jessup made this: "Query: If no proof were available, would not this case practically sustain the partial revocation attempted by the testator?" (§ 320.)

The Appellate Division in its opinion (169 App. Div. 388) gives no express consideration to the apparently contrary ruling that was made six years before in the *Curtis* case, although both appeal

briefs discussed it. The respondent in his brief went so far as to say: " At the time of the trial we were of the opinion that to allow the probate of the will the contents of the missing provisions would have to be established. The surrogate differed with us on this. While we have been able to find no case admitting a will with part of its provisions unknown, we are able to see  *   *   * " now the distinction, which the respondent then proposed, and which the court substantially adopted by saying in its opinion: " The weight of authority seems to favor the probate of that part of the will which remains, even if the  *   *   *  obliterated parts cannot be ascertained, unless it can be seen that the missing parts would affect or alter the remaining parts." From the nature of that qualification it is clear that in every application of this rule there will be more or less conjecture as to the fact; and very often considerable doubt whether the property involved in the " unrevoked " missing clauses is to fall into the residue, or, if there be no residuary clause, whether it should go as in intestacy, notwithstanding the missing clause, in any event, must be deemed to be still "unrevoked."

The objections to the general part of the rule above set forth (Cornell Law Quarterly, vol. 1, p. 215) do not stand in the way of probating the " remains," so long as this *Kent* case continues to be the rule of this Fourth Department, or until the Legislature shall see fit to enact a more liberal, practical and consistent statute on revocation. The respondent's position, at bottom, is opposed to what the policy of our statute (Dec. Est. Law, § 34) has been held to be, owing to its peculiar wording. The consequences justify criticising the impractical attempt that was made, either by a legalistic enactment, or by an equally unwise literalism, to galvanize back into life what the testator had successfully killed in a most practical way. If relief is to come by following the wisdom of the practical English rule, the argument must, apparently, now be addressed to the Legislature.

Meantime, it is more pertinent to try to determine what will be a legal disposition of the property involved in the missing, but " unrevoked " portions of the mutilated will. Where there is slight, if any, likelihood the missing portion will ever be proven, *e. g.*, in the case of the absolutely undecipherable obliteration of the amount of a legacy, in a home-made holograph (*Matter of Enright*, 139 Misc. 192), it is practically safe in fact — whatever it may be in law — to declare *intestacy* has resulted, where there follows no residuary clause to gather in the slain and the fallen. Where, however, the will was the output of a modern law office, as was the will at bar, the case is not so simple, especially, if a residuary clause appears intact in the " remains."

Here the missing parts are of two classes — one which will, upon a practically total failure, go to increase the residue; and the other which, in the comparatively not unlikely event of the missing part being found or proven, or partially ascertained, would lessen the remainder, possibly, altogether. In the second case it is far more unsafe than in the first, or in the holograph obliteration case cited above, to transfer the property to the residuary legatee, unless the remainderman were required to give a bond for restitution to the legatee, if and when the latter succeed in proving the text of this part of the will.

As to the " keepsake " legacies, the evidence is so unsatisfactory as to their purport and content that they cannot be admitted; but the unknown legatees not having been made parties as such, and their legacies not having been " legally revoked," the most the court could now do, if anything, would be to order, so far as their subject-matter is definite, that the specific property be separately sold by the executor, and the several avails be deposited with the State Treasurer until such legatees should establish their respective right thereto.

As to the trust for the " uses and benefits " of the husband for and during his life, with the remainder, if any, over to the three cousins, it cannot be said that the contents of those clauses has been " clearly and distinctly proven." No " correct copy or draft " was produced to supply the place of the second witness. Our only knowledge of them derives from the attorney's testimony, and from the wording of the residuary clause itself, and that of the power of sale. Does it follow that those unrevoked " uses and benefits " are forfeited to the remainderman, or that this decree must foreclose the life beneficiary ever hereafter proving what those missing, but still " unrevoked " provisions were?

If this residuary clause go to probate, its terms require that the principal and income of the residuary estate be held intact until the husband die or sooner prove the missing provisions. As to principal this might be valid; but such accumulation of income would be invalid, for the husband is an adult. (*Matter of Reese*, 142 Misc. 697.) Then, it may be asked, will such undisposed-of rents and profits " belong to the persons presumptively entitled to the next eventual estate," because " no valid direction for their accumulation is given? " Is it not rather a case where one such was presumably given, but has not yet been probated? As it is not altogether improbable the life beneficiary may yet succeed in fully proving those clauses, should not the remaindermen here also be required to give bond for restitution to him, or his estate, if

and when such proof has been produced, of the net income they may meantime receive from the principal?

Under the test laid down in the *Kent* case, this inter-relation stands in the way of probate. It does not follow, however, that the estate is presently distributable as in intestacy. A will is not revoked simply because it is lost. Under our legalistic rule, we must say this will is all still in legal existence, because none of it was " legally revoked," and the half of it now actually before the court was found in testatrix's own trunk, in her bedroom, hidden under some blankets, while her disinherited husband was living in the same house with her till she died. She knew where it was all the time. She had preserved it under a mistake of law that it would serve an altered purpose.

It has been suggested that the first two clauses, at least, could now be carried out by paying her debts and funeral expenses and by turning over the $100 mentioned in the second clause to the cemetery trustees for perpetual care of her burial lot, but, apparently, the whole will must be hung up until the surviving husband die, or the missing parts be sooner fully proven.

It would be impractical and confusing to record the " remains " among wills, and suspend the present effectiveness of some parts of them, and issue letters testamentary on the first, second and eighth clauses, except in so far as the last two mentioned are involved with the missing provisions, with provisos for discovery or proof of the missing parts, and for restitution.

Under the rule " *stare decisis*," therefore, the only thing this court can now do is to deny probate to this will as a whole, without prejudice, however, to the right of any party in interest to make such further or other application in the premises, either to this court or [to the Supreme Court, as the facts may hereafter be deemed to warrant; and meantime to grant to the person named as executor in the propounded paper letters of temporary administration, for the preservation of the assets of the estate until the widower, Herman Dryer, die, or the " unrevoked " missing portions of this will be sooner proven according to the statute. Meantime, a temporary administrator will be directed, under the statute (Surr. Ct. Act, § 314, subd. 3), to pay the debts and funeral expenses, including in the latter the sum of $100 for perpetual care of the burial lot, to be paid to the trustees of the cemetery named in clause second of the propounded paper.

Submit for entry a decree in accord with this decision, with provision for taxable costs herein, to be paid later by a temporary administrator under further order of this court, out of the assets.